UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>TRUNG NGUYEN,<br><br>a/k/a "DCS420",<br><br>Defendant | Criminal No.    23cr10148<br><br>Violations:<br><br>Count One: Operating an Unlicensed Money Transmitting Business<br>(18 U.S.C. § 1960(a), (b)(1)(B), and (b)(1)(C))<br><br>Count Two: Money Laundering<br>(18 U.S.C. § 1956(a)(1)(B)(i))<br><br>Count Three: Money Laundering<br>(18 U.S.C. §§ 1956(a)(3)(B))<br><br>Forfeiture Allegation:<br>(18 U.S.C. 982(a)(1)) |

## INDICTMENT

At all times relevant to this Indictment:

### Introduction

1.      Between in or about September 2017 and in or about October 2020, the defendant, TRUNG NGUYEN, owned and operated National Vending, LLC ("National Vending"), a "no questions asked" unlicensed money transmitting business. Through National Vending, Nguyen accepted cash from customers and, in exchange for a fee, sent them digital currency in return.

2.      In just over three years, NGUYEN converted approximately $1 million in cash to Bitcoin for scammers and drug dealers, among others, including financial transactions involving the proceeds of specified unlawful activity and property represented to be the proceeds of specified unlawful activity. NGUYEN concealed his unlicensed money transmitting business behind a

shell company, through false statements and structured financial transactions, and by willfully ignoring Anti-Money Laundering ("AML") regulations that applied to National Vending.

General Allegations

3.      The defendant, TRUNG NGUYEN ("NGUYEN"), a/k/a "DCS420", lived in Danvers, Massachusetts.

4.      NGUEYN owned and operated Vioclean, Inc. ("Vioclean"), an abatement business located in Swampscott, Massachusetts that specialized in repairing property after it had been damaged by water or fire.

5.      "Bitcoin" was a form of virtual currency existing entirely on the internet and not in any physical form.   It was not issued by any government, bank, or company, but rather was generated and controlled automatically through computer software operating on a decentralized, "peer-to-peer" network.

6.      To acquire Bitcoins, users typically purchased them from a Bitcoin "exchanger". In return for a commission, Bitcoin exchangers accepted payments in conventional currency, such as U.S. dollars, which they exchanged for a corresponding number of Bitcoins based on a fluctuating exchange rate.

7.      When users acquired Bitcoin, exchangers sent the Bitcoin to the users' Bitcoin "addresses," which were analogous to bank account numbers and were designated by a complex string of letters and numbers.   Users could then conduct transactions with other Bitcoin users, by transferring Bitcoins to and from their Bitcoin addresses over the internet.

8.      Exchangers of virtual currency, including Bitcoin exchangers, were money transmitters under federal law and were subject to federal AML regulations which, among other

2

things, required virtual currency exchangers to register as money service businesses with the Department of Treasury's Financial Crimes Enforcement Network ("FinCEN") and to maintain effective AML programs, including by filing Suspicious Activity Reports with FinCEN, and by filing Currency Transaction Reports for Bitcoin-for-cash exchanges of more than $10,000.

### National Vending - Nguyen's Unlicensed Money Transmitting Business

9.      On or about September 21, 2017, NGUYEN incorporated National Vending in Massachusetts as a purported vending machine business.

10.     NGUYEN established bank accounts in National Vending's name at TD Bank, Bank of America, Santander Bank, and RTN Federal Credit Union.

11.     Between September 2017 and October 2020, National Vending had no operations, revenue, or expenses relating to vending machines.

12.     Instead, as set forth below, NGUYEN used National Vending to deposit cash that he received in cash-for-Bitcoin exchanges, to receive customers' electronic transfers that he would convert to Bitcoin, and to purchase Bitcoin that he offered for sale.

13.     Between in or about September 2017 and in or about October 2020, Nguyen did not register National Vending with the Secretary of the Treasury as a money transmitter as required by Title 31, United States Code, Section 5330, and regulations promulgated thereunder.

### Digital Assets – Nguyen's Shell Money Transmitting Business

14.     On or about September 26, 2017, five days after NGUYEN created National Vending, Nguyen incorporated Digital Assets, LLC ("Digital Assets") in Massachusetts.

15.     On or about that same date, September 26, 2017, NGUYEN registered Digital Assets with FinCEN as a money transmitting business.

3

16.    Although NGUYEN registered Digital Assets as a money service business, between in or about September 2017 and in or about October 2020, he did no business through it or through bank accounts in its name.    Instead, as noted above, NGUYEN conducted his money transmitting business exclusively through National Vending

17.    It was part of NGUYEN's operation of his unlicensed money transmitting business that he:

a.    advertised on online digital currency exchanges, including LocalBitcoins.com and Paxful, that he was selling Bitcoin for cash;

b.    advertised that he was "Available 7 Days a Week with No Questions Asked!!";

c.    used the online nickname "DCS420", an apparent reference to marijuana, on peer-to-peer exchanges.

d.    offered "anonymous" Bitcoin-for-cash trades and assured the "privacy" of potential customers;

e.    accepted cash (for conversion to Bitcoin) during face-to-face meetings, through the mail, by electronic payment, such as Zelle or Western Union, and by having customers from throughout the United States deposit cash into National Vending's bank accounts; and

f.    offered to exchange amounts that were greater than the dollar limits that peer-to-peer cryptocurrency exchanges set as part of their own AML programs.

18.    NGUYEN kept banks, financial regulators, and law enforcement officials from detecting his unlicensed money transmitting business by:

a.    deliberately failing to register National Vending as a money transmitting business;

b.    deliberately conducting no financial transactions through Digital Assets, his registered money transmitting business;

c.    purchasing, on Digital Assets' behalf, an over-the-counter AML program that NGUYEN had no intent to implement;

d.    falsely reporting to banks, cryptocurrency exchanges, and state officials that National Vending was a home-based vending machine business;

e.    giving National Vending a business name that was consistent with the kind of business that would accept large cash deposits;

f.    using Signal, an encrypted messaging platform, to communicate with potential customers;

g.    engaging in Bitcoin-for-cash transactions in amounts that exceeded LocalBitcoins and Paxful's trading limits;

h.    requiring customers submitting cash by mail to provide a written note falsely indicating that they were making "personal" Bitcoin purchases, rather than exchanging cash for Bitcoin on behalf of a third party or engaging in criminal activity;

i.    directing customers to send bulk cash for general delivery to a UPS Store in Swampscott, Massachusetts, where NGUYEN claimed the packages;

j.    failing to file any Suspicious Activity Reports or Currency Transaction Reports detailing Bitcoin-for-cash transactions in which he engaged, including cash transactions of more than $10,000;

k.      transferring Bitcoin to customers using technologies that made it more difficult to trace those transactions;

l.      depositing the cash proceeds of his Bitcoin sales into bank accounts in National Vending's name, and not into bank accounts in the name of Digital Assets;

m.      structuring the cash proceeds of Bitcoin-for-cash exchanges into National Vending's bank accounts, including by breaking cash deposits of more than $10,000 into smaller cash deposits of less than $10,000 over consecutive days, and by depositing cash at different branches of the same bank on the same day;

n.      falsely reporting to cryptocurrency exchanges that NGUYEN was purchasing Bitcoin on behalf of Vioclean, or with proceeds from Vioclean's remediation business or from real estate transactions;

o.      purchasing Bitcoin in the name of National Vending, and not in the name of Digital Assets;

p.      purchasing Bitcoin from other unlicensed money transmitters;

q.      concealing records of his Bitcoin-for-cash business in the ceiling above Vioclean's offices;

r.      enrolling in and taking instruction on concealing his business from Business 1, a Utah-based organization that, in exchange for a fee, taught unlicensed money transmitters how to avoid detection.   Business 1, among other recommendations, recommended to NGUYEN that he purported to operate "a business for which cash deposits from around the country make sense", suggested that NGUYEN "develop [his] cover story", "create a list of your suppliers.   Fictitious of course", and "Don't say the word 'Bitcoin' :)".

6

Specific Transactions

*Individual 1*

19.     Approximately 15 times between in or about February and November 2018, at Vioclean's offices, in public parking lots in Massachusetts, and in New Hampshire, NGUYEN sold Bitcoin to Individual 1, a methamphetamine dealer.

20.     Over this period, Individual 1 gave NGUYEN between approximately $200,000 and $300,000 in cash in exchange for Bitcoin.

21.     NGUYEN charged Individual 1 a commission of approximately 10 percent for each of these trades, a rate several times higher than the commissions charged by Bitcoin exchanges that registered with FinCEN and followed AML procedures.

22.     Early in their financial relationship, Individual 1 told NGUYEN in substance that Individual 1's cash came from the sale of methamphetamine.

23.     On or about June 18, 2018, after Individual 1 explained that his cash came from methamphetamine sales, NGUYEN transferred to Individual 1 approximately 4.1524 Bitcoin in exchange for $36,820 in cash.

*Individual 2*

24.     Individual 2 was a 59-year old romance scam victim who lived in Worcester County, Massachusetts.

25.     In or about March 2020, a man named "Dixon"—whom Individual 2 met on an online dating site and who claimed to be an American businessman overseas—arranged for Individual 2 to receive cash deliveries by mail.   The cash sent to Individual 2 was sometimes

concealed in toys, stuffed animals, and books.   "Dixon" directed Individual 2 to convert the cash to Bitcoin and told Individual 2 that the money was either money lent or owed to him by creditors.

26.   "Dixon" and Individual 2 identified NGUYEN from his advertisements on Paxful.

27.   Individual 2 met NGUYEN in locations on Boston's North Shore, where Individual 2 gave cash to NGUYEN and received Bitcoin in return.

28.   NGUYEN charged Individual 2 a seven percent commission.

29.   Individual 2 and NGUYEN communicated by text messaging and Signal, the encrypted messaging application.

30.   Between in or about March and September 2020, Individual 2 exchanged approximately $65,000 cash for Bitcoin through NGUYEN.

*Undercover Transactions*

31.   On or about October 1, 2018, in a Starbucks parking lot in Saugus, Massachusetts, NGUYEN accepted $14,700 from an undercover law enforcement officer ("UC1") and in exchange sent 2.1705 Bitcoins to UC1's Bitcoin address.   Although FinCEN regulations required that NGUYEN report a cash transaction of more than $10,000, NGUYEN told UC1 that he was not going to file any paperwork.   NGUYEN took a commission of approximately 5.5 percent on the transaction.

32.   On or about February 8, 2019, at Vioclean in Swampscott, Massachusetts, NGUYEN accepted $25,000 from UC1 and in exchange sent 6.99108 Bitcoins to UC1's Bitcoin address.   NGUYEN took a commission of approximately 5 percent on the transaction.

33.   On or about March 1, 2019, at Vioclean's offices in Swampscott, Massachusetts, NGUYEN accepted $30,000 from UC1 and in exchange sent 3.5 Bitcoins to UC1's Bitcoin

address, and at UC1's request, sent 4 Bitcoins to a separate address that UC1 represented belonged to an unnamed person to whom UC1 owed money, but that in fact also belonged to undercover law enforcement personnel.   NGUYEN took a commission of approximately 5 percent on the transaction.

34.    On or about September 9, 2019, in the parking lot of a Target store in Woburn, Massachusetts, NGUYEN accepted $30,000 in cash from a second undercover law enforcement agent ("UC2") and in exchange sent 2.77 Bitcoins to a Bitcoin address that UC2 controlled. Nguyen took a commission of approximately five percent on the transaction.

35.    On or about September 22, 2019, in the parking lot of a Target store in Woburn, Massachusetts, NGUYEN accepted $36,000 in cash from UC2 and in exchange sent 4.15 Bitcoins to a Bitcoin address that UC2 controlled.   NGUYEN took a commission of approximately five percent on the transaction.   Before Nguyen sent the Bitcoin to UC2, UC2 told NGUYEN that his business was delivering Adderall to gamblers at a casino in Massachusetts.

COUNT ONE
Operating an Unlicensed Money Transmitting Business
(18 U.S.C. §§ 1960(a), (b)(1)(B), and (b)(1)(C))

The Grand Jury charges:

36.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 to 35 of this Indictment.

37.     Between in or about September 2017 and in or about September 2020, in the District of Massachusetts, and elsewhere, the defendant,

TRUNG NGUYEN,
a/k/a "DCS420",

did knowingly conduct, control, manage, supervise, direct, and own all and part of an unlicensed money transmitting business, to wit, a money transmitting business affecting interstate and foreign commerce that failed to comply with the money transmitting business registration requirements under Title 31, United States Code, Section 5330, and regulations prescribed thereunder, and that transported and transmitted funds known to the defendant to have been derived from a criminal offense and that were intended to be used to promote and support unlawful activity.

All in violation of Title 18, United States Code, Sections 1960(a), (b)(1)(B), and (b)(1)(C).

COUNT TWO
Money Laundering
(18 U.S.C. § 1956(a)(1)(B)(i))

The Grand Jury further charges:

38.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 to 35 of this Indictment.

39.     On or about June 17, 2018, in the District of Massachusetts and elsewhere, the defendant,

TRUNG NGUYEN
a/k/a "DCS420",

did conduct and attempt to conduct a financial transaction, to wit, exchanging cash for Bitcoin, knowing that the property involved in such transaction represented the proceeds of some form of unlawful activity, and which in fact involved the proceeds of specified unlawful activity, that is, distribution of and possession with intent to distribute controlled substances, contrary to Title 21, United States Code, Section 841, and knowing that the transaction was designed, in whole and in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity.

All in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

COUNT THREE
Money Laundering
(18 U.S.C. § 1956(a)(3))

The Grand Jury further charges:

40.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 to 35 of this Indictment.

41.     On or about September 22, 2019, in the District of Massachusetts and elsewhere, the defendant,

TRUNG NGUYEN
a/k/a "DCS420",

did conduct and attempt to conduct a financial transaction involving property represented by UC2 to be the proceeds of specified unlawful activity, that is, distribution of and possession with intent to distribute Adderall, a controlled substance, contrary to Title 21, United States Code, Section 841, with the intent to conceal and disguise the nature, location, source, ownership, and control of property believed to be the proceeds of the specified unlawful activity.

In violation of Title 18, United States Code, Section 1956(a)(3)(B).

## MONEY LAUNDERING AND UNLICENSED MONEY TRANSMITTING BUSINESS
## FORFEITURE ALLEGATION
(18 U.S.C. § 982(a)(1))

42.     Upon conviction of one or more of the offenses in violation of Title 18, United States Code, Sections 1956 and 1960, set forth in Counts One through Three of this Indictment, the defendant,

TRUNG NGUYEN,
a/k/a "DCS420",

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such offenses, and any property traceable to such property, including the property below, all seized on January 7, 2021:

a.     $50,000.00 in United States currency seized from the premises of Vioclean, in Swampscott, Massachusetts;

b.     $34,590.00 United States currency seized from the basement of NGUYEN's residence;

c.     One silver bar seized from the basement of NGUYEN's residence;

d.     Sixteen one-ounce silver dollars seized from the basement of NGUYEN's residence;

e.     Four one-ounce silver coins with Bitcoin markings seized from the basement of NGUYEN's residence;

f.     Twenty-one one-ounce Canadian silver coins seized from the basement of NGUYEN's residence;

g.     0.41022713 BTC seized from a Ledger wallet located in the bedroom of NGUYEN's residence;

13

       h.      0.08904487 BTC seized from a Coinomi wallet;

       i.      6.1801982 BTC seized from an Exodus wallet;

       j.      1956.66822639 Chainlink;

       k.      56,561.078914 Cardano;

       l.      0.06950985 Ethereum; and

       m.      0.25945221 Monero.

43.     If any of the property described in Paragraph 42, above, as being forfeitable pursuant to Title 18, United States Code, Section 982(a)(1), as a result of any act or omission of the defendant

    a.  cannot be located upon the exercise of due diligence;

    b.  has been transferred or sold to, or deposited with, a third party;

    c.  has been placed beyond the jurisdiction of the Court;

    d.  has been substantially diminished in value; or

    e.  has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 42 above.

All pursuant to Title 18, United States Code, Section 982(a)(1).

A TRUE BILL

FOREPERSON

SETH B. KOSTO
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS

/s/ Leonardo T. Vieira, signed at 12:35pm

District of Massachusetts:   May 30, 2023
Returned into the District Court by the Grand Jurors and filed.